## GARRETT and others *v.* SAYLES and others.

## SAYLES and others *v.* GARRETT and others.

*(Circuit Court, D. Rhode Island. March 1, 1880.)*

CORPORATION—PERSONAL LIABILITY OF STOCKHOLDERS—BONDS SECURED BY MORTGAGE OF CORPORATE PROPERTY.—The issue of negotiable bonds, secured by mortgage upon all the property of a corporation, and allotted *pro rata* to the stockholders, does not relieve such stockholders from their personal liability, under the statutes of Rhode Island, to the assignees of such bonds.

BANKRUPT STOCKHOLDER — CONTINUING LIABILITY — INDEMNITY OF AS-
SIGNEE IN BANKRUPTCY.—A stipulation by a purchaser of such bonds to
indemnify the assignee in bankruptcy of the original holder of a part of
such bonds against all liability as a stockholder in said corporation, does
not relieve the bankrupt or other members of the corporation from their
personal obligation to the purchaser of such bonds.

The American File Company was incorporated by an act
of the legislature of Rhode Island in May, 1863, and was
organized in the June following. The company bought a pat-
ent under which the manufacture of files had been before
carried on in Baltimore, and the persons who sold them the
patent took nearly one-half the stock of the new company.
The capital appears to have been insufficient for the business,
and for some years money was raised or credit was obtained
upon the notes of the company, indorsed by the stockholders,
all of whom were liable for the debts of the company under
the statutes of Rhode Island, relating to manufacturing cor-
porations, by reason of the omission to file certain statements
necessary to relieve that liability. ·

In 1870 the company duly resolved to issue bonds, secured
by a mortgage of all their corporate property, real and per-
sonal, to be offered to the stockholders, *pro rata*, until April
1, 1870, and such as were not then taken were to be disposed
of "in the order of applicants." The bonds and mortgage
were made accordingly. The bonds were payable to bearer
in five years from January 1, 1870, with interest at 10 per
cent. per annum, for which coupons were attached to them.
Allen A. Chapman was the principal stockholder in Balti-
more, and he took and paid for, in the indorsed notes of the
company, the full proportion of bonds allotted to the stock-
holders in that city. The notes with which he paid for them
belonged to his firm of Kirkland, Chase & Co. Several of the
smaller stockholders refused to subscribe, and he, or his firm,
retained the bonds.

Kirkland Chase & Co. were merchants doing a large busi-
ness in Baltimore, and for 30 years or more they had dealt
with the plaintiffs, Robert Garrett & Sons, bankers, of Balti-
more, and among other things they used to borrow money of
the bankers upon collateral security. In the summer of 1872

the current debt was about $500,000. Among other loans was one of $50,000, made May 10, 1872, for which notes of third persons were deposited. These were afterwards exchanged for a cargo of sugar imported by the Shiloh, for which Kirkland, Chase & Co. deposited with Garrett & Sons the warehouse receipt. By the arrangement between the parties all securities were to be held for the general balance of account.

Kirkland, Chase & Co. failed, July 11, 1872, and it was then made known, for the first time, to Garrett & Sons that the cargo of sugar had been sold on the thirtieth of May, while they still held the warehouse receipt. Presently, after the failure, Chapman handed to Garrett & Sons, instead of the cargo of sugar, the bonds of the file company, with an assignment, dated May 30, 1872. The firm of Kirkland Chase & Co. and each of its members, became bankrupt in October, 1872, and the assignees disputed the title of Garrett & Sons to these bonds and several other securities as a fraudulent preference. A settlement was afterwards made by which the assignees relinquished all title to the several securities, and paid certain moneys to Garrett & Sons, and the latter relinquished the right to prove against the assets for the excess of their debt above the value of the securities, which turned out to be a very considerable sum. The agreement, which was approved by the court of bankruptcy and carried out, was in writing, and contained this stipulation: "And said Robert Garrett & Sons likewise further agree that, whereas, said assignees have been offered the sum of 50 cents on a dollar for certain bonds of the American File Company, now held by Messrs. Robert Garrett & Sons, which were received as collaterals from Messrs. Kirkland, Chase & Co,, and an indemnification against loss or damage of any kind as holders of certain stock of said American File company as assignees of A. A. Chapman and Kirkland, Chase & Co., said Robert Garrett & Sons hereby agree to indemnify said assignees against loss or damage of any kind as holders of the stock aforesaid; and, in consideration of said acts of said assignees, said Robert Garrett & Sons do

also hereby agree to indemnify the said assignees, and the estate of Kirkland, Chase & Co., and the estate of A. A. Chapman, against loss or damage of any kind, for releasing their claim to said bonds of the American File Company, now held by Messrs. Robert Garrett & Sons, and agree to hold said assignees and said estates harmless for said transfer and release."

The affairs of said Kirkland, Chase & Co. had been nearly settled, and the several bankrupts had been discharged, before this case was begun.

In June, 1876, Garrett & Sons brought an action upon the bonds in the supreme court of Rhode Island, and recovered judgment against the American File Company, the amount of principal and interest $132,611.33, with $51.10 costs.

As the law then stood, creditors recovering judgment against a manufacturing corporation, whose stockholders were liable for its debts, might levy their execution upon the persons and property of such stockholders, as if for their own proper debts. The Rhode Island stockholders of the file company thereupon filed a bill in equity in the supreme court of Rhode Island to enjoin Garrett & Sons from levying their execution upon them or their property, alleging that when the bonds of the corporation were issued, in 1870, the arrangement was that the bonds were a final payment of the debts of the company, relieving the stockholders from liability, and requiring them to look for payment of the bonds only to the property which was mortgaged to secure them, or at all events to the property of the company, and not to the personal responsibility of the stockholders; that Garrett & Sons had notice of this equity when they acquired their title to the bonds, and stood in the place of Chapman, or Kirkland, Chase & Co.; that the plaintiffs had besides agreed to indemnify the assignees of those shareholders, and that a court of equity would enforce that liability in a suit between the plaintiffs and defendants, to save the circuity of action which would ensue if the defendants should call on the assignees for contribution, and they again on the plaintiffs for indemnity. To

this bill Garrett & Sons filed an answer, and the plaintiffs replied. The cause was then removed to this court.

In 1877 the legislature of Rhode Island passed an act taking away the right to levy upon stockholders an execution upon a judgment against such corporations, and substituting a suit in equity, or action of debt. Garrett & Sons afterwards brought a bill in this court against the stockholders of the file company resident in Rhode Island, to which they filed an answer, setting up the same equities which they had relied on in their bill filed to restrain the execution. Evidence was taken to be used in both cases, and they were heard together.

*James Tillinghast* and *John K. Cowen*, for Garrett & Sons.

*A. Payne* and *Chas. Hart*, for W. F. Sayles and others.

LOWELL, J. For convenience, we shall call Garrett & Sons, plaintiffs, and Sayles and others, stockholders of the American File Company, defendants.

We need not consider the bill filed in the state court by these defendants to restrain the plaintiffs' levy of execution, and removed to this court, because our power to stay a process issuing out of the state court is doubtful, unless when such injunction had been issued while the case was in the state court; and because the plaintiffs, while insisting that the law of 1877, abolishing the remedy by levy upon the stockholders and substituting a bill in equity, cannot be enforced against them consistently with the constitution of the United States, or with that of Rhode Island, have acquiesced in fact and brought their bill in this court under that act, and the pleadings in that suit raise all the questions between the parties.

The defendants, admitting that they are stockholders of the corporation and liable generally for its debts, set up against these plaintiffs two equitable defences.

The first is that the stockholders, in the year 1870, agreed to pay the debts of the company in substantial accordance with their respective ultimate liabilities, *inter sese*, by taking bonds in that proportion, and to look for reimbursement to the property conveyed in mortgage to trustees to secure the

bonds, or to that property and any which the company might afterwards acquire.

We see no evidence that the parties concerned, the stockholders, made any such agreement as is here supposed. Being under a statute liability for the debts of the company, and choosing to remain so—for they could have put an end to this state of things by filing an annual statement of their affairs—they found it more convenient to raise money by negotiating bonds with five years to run, rather than notes which needed to be often renewed. They secured their negotiable bonds by a mortgage, in order to increase their value, not to diminish it. It was an ordinary arrangement, which had no concealed equities. The negotiable bonds were to be negotiable, and to have the same properties in the hands of the shareholders as in those of other "applicants" who should take them. No doubt one principal motive which induced the shareholders to take the bonds in the first instance was that the company must be kept afloat; but there was no agreement expressed, and none arises from the nature of the transaction, that the bonds should not be sold, or that they should hold good only against the property of the company.

· We suppose it to have been taken for granted that the bonds were amply secured, in which case no such question as is now before us could have arisen. At any rate, it appears, from the correspondence between the parties and from the votes, and all the evidence in the record, that the bonds were intended to be what they purport to be, the negotiable promises of the corporation, as much so as the notes for which they were substituted.

The second defence is that the plaintiffs have agreed to stand in the place of stockholders by their stipulation to indemnify the assignees of Chapman as such stockholders.

We agree that if the assignees, when this stipulation was made, were stockholders in the sense of being liable for the debts of the company, the defence is a good one to the extent of their proportionate share of the debts, so that the plaintiffs could only recover in equity the difference between the price of their bonds and such proportionate liability. This

equity does not depend upon privity of contract, but upon an equitable duty. *Dering* v. *Earl of Winchelsea*, 1 Lead. Cas. Eq. (4th Am. Ed.) and notes.

We are of opinion, however, that under the statutes of Rhode Island neither assignees in bankruptcy, nor the assets in their hands, are liable to contribute under the circumstances stated in the record, which are, simply, that they have in their possession the certificates of stock, and recite in the agreement with the plaintiffs that they are stockholders. It does not appear how far, if at all, they have acted as stockholders, and it is certain that they had nothing to do with contracting this debt.

In Massachusetts, where the law is as nearly as possible identical with that of Rhode Island, the liability was held not to attach, though the assignees had attended and voted at meetings of the stockholders, and done other unequivocal acts of ownership. *Gray* v. *Coffin*, 9 Cush. 192.

The general law of bankruptcy would give the same answer to the question. It is an anomaly, perhaps, but it is the undoubted rule, that assignees are not bound to accept onerous property. Its application to leaseholds is familiar. *Mills* v. *Aureol*, 1 Smith Lead. Cases, (7th Am. Ed.) 1116 and notes; and as to an onerous litigation or contract, *Smith v. Jordan*, 6 Law Rep. 313; *Streeter* v. *Sumner*, 31 N. H. 542; *Amory* v. *Lawrence*, 3 Clifford, 523.

The rule has been often applied to shares in a company liable to the *onus* of assessments, or calls, as they are called in England, and would apply *a fortiori* to an unlimited liability. See *Re Lond & Prov. Teleg. Co.* L. Rg. Eq. 653; *South Staffordshire R. Co.* v. *Burnside*, 5 Ex. 129; *Levi* v. *Ayres*, 3 App. Cas. 342; *Metropolitan Bk.* v. *Offord*, L. R. 10 Eq. 398.

The peculiar statutory liability imposed upon shareholders in New England is not one which can be proved as a debt against a bankrupt's assets unless it is liquidated and ascertained by a decree in equity before the time for proving debts has gone by. *Kelton* v. *Phillips*, 3 Met. 62; *Bangs* v. *Lincoln*, 10 Gray, 600; *James* v. *Atlantic Delaine Co.* 11 N. B. R. 390. It follows that Chapman, or the several members

of his firm, according to the fact of ownership, would remain personally liable to contribute to the debts of the corporation notwithstanding their discharge in bankruptcy, because only provable debts are discharged, and because they would remain shareholders. See *Martin's Patent Co.* v. *Morton*, L. R. 32, B. 306; *Hasties Case*, L. R. 7, Eq. 3, 4 Ch. 274. It is plain, upon inspection of the contract between the plaintiffs and the assignees of Kirkland, Chase & Co., that the former did not undertake to become stockholders of the corporation, nor to indemnify Chapman or the members of the firm personally, but that out of abundant caution the assignees took an indemnity for themselves and the estate in their hands, and, since the assignees are not liable, there is no claim or right to which the defendants can be subrogated.

Equity might require the plaintiffs to apply the mortgaged property, or to call upon the trustees of the mortgage to apply it to diminish the debt, so far as it would go, before a final decree should be rendered against the defendants. The pleadings do not raise this question, and we understood at the argument that the property had been converted into money and would be properly disposed of without the intervention of the court. We decide, therefore, that in the bill filed by Garrett & Sons, there must be an interlocutory decree for complainants.